Morrison Industries, Inc., Transferee, et al. * v. Commissioner. Morrison Industries, Inc. v. Commissioner
Docket Nos. 78202, 78203, 78205, 78206, 78207, 84398.
United States Tax Court
T.C. Memo 1962-155; 1962 Tax Ct. Memo LEXIS 154; 21 T.C.M. (CCH) 853; T.C.M. (RIA) 62155; June 26, 1962
John Kennedy Lynch, Esq., The Superior Bldg., Cleveland, Ohio, for the petitioners. William O. Allen, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax for Lake City Malleable, Inc. for the year ended October 31, 1956 of $5,323.06 and an addition to tax under section 6651(a) of the Internal Revenue Code of 1954 of $798.46. The Commissioner also determined transferee liabilities against the following named petitioners as transferees of Lake City Malleable, Inc. in the following amounts: Lake City Malleable Company
$369,973.88
Machinery Terminals, Inc.
369,973.88
Albert-Harris, Inc.
38,000.00
Sydney L. Albert
369,973.88
In addition, the Commissioner determined liabilities against the *156 following named petitioners as transferees of a transferee of Lake City Malleable, Inc., in the following amounts: Morrison Industries, Inc.
$369,973.88
Machinery Terminals, Inc.
369,973.88
Sydney L. Albert
369,973.88
The issues presented are: (1) Whether the gain realized by Lake City Malleable, Inc. upon the sale of tools, equipment and maintenance supplies is a long-term capital gain or ordinary income; (2) whether Lake City Malleable, Inc. is liable for an addition to tax under section 6651(a) of the Internal Revenue Code of 1954; (3) whether Lake City Malleable Company, Transferee, Machinery Terminals, Inc., Transferee, Albert-Harris, Inc., Transferee, and Sydney L. Albert, Transferee, are liable as transferees for the unpaid income tax liabilities of Lake City Malleable, Inc.; (4) whether Morrison Industries, Inc., Transferee, Machinery Terminals, Inc., Transferee, and Sidney L. Albert, Transferee, are liable as transferees of a transferee for the unpaid income tax liabilities of Lake City Malleable, Inc. Findings of Fact Some of the facts have been stipulated and are so found. Lake City Malleable, Inc., hereinafter referred *157 to as LCM, Inc., an Ohio corporation since 1944, is the wholly-owned subsidiary of Lake City Malleable Company, hereinafter referred to as LCM Co., and had been engaged in the manufacture of malleable iron at a plant in Ashtabula, Ohio. It filed an income tax return for its taxable year ended October 31, 1956, with the district director of internal revenue, Cleveland, Ohio. Since 1953 LCM Co. has been the wholly-owned subsidiary of Machinery Terminals, Inc., hereinafter referred to as Machinery Terminals. Sydney L. Albert, hereinafter referred to as Albert, a resident of Akron, Ohio, has been the sole shareholder of Machinery Terminals, except for qualifying shares, since 1953, and from 1953 to date Albert has been president and Charles Holland has been vice president of LCM, Inc. and LCM Co.
Columbus Malleable Iron Co. is another wholly-owned subsidiary of LCM Co.
The Cambridge Company was a wholly-owned subsidiary of Albert & Son Machinery Corporation, the stock of which was owned by Albert and Machinery Terminals. In 1956 Albert decided to liquidate LCM Co. and its subsidiaries. On April 1, 1956, Columbus Malleable Iron Co. transferred all its net assets to Pierce Governor *158 Company in return for 60,000 shares of the common stock of Pierce Governor. Columbus Malleable Iron Co. disposed of these shares in April and June 1956. On October 31, 1956, the end of Columbus Malleable Iron Co.'s fiscal year, its assets consisted of two accounts "Due from affiliated companies" and "Inter company accounts" with debit balances aggregating $1,480,070.62. Columbus Malleable Iron Co. did not file a federal income tax return for 1956. In 1956 Shiah M. Arsham and his cousins, Harold and Sanford Arsham, owned all the stock of L. B. Lockwood Co. Prior to 1956 they owned 50 percent of the stock; however, in 1956, they acquired the remaining shares with funds provided by Albert. On May 7, 1956, the following transactions occurred in Toronto, Ontario: (1) Acme Subdivisions, Limited, a Canadian corporation, borrowed $5,000,000 from The Bank of Nova Scotia. (2) Morrison Brass Corporation, Limited, also a Canadian corporation, issued 1,250,000 of its shares of common stock to Acme Subdivisions, Limited, for $5,000,000. (3) Alert Investments, Limited, hereinafter referred to as Alert Investments, also a Canadian corporation, purchased all of the operating assets of *159 LCM Co. (i.e. all of the assets except the stock of Columbus Malleable Iron Co. and LCM, Inc., and accounts and notes receivable and payable to or from Albert and related corporations) for $1,500,000. In return therefor Alert Investments gave to LCM Co. Alert Investments' demand non-interest bearing note in the amount of $1,500,000. (4) Alert Investments purchased all of the assets of The Cambridge Company for $2,540,000. In return therefor Alert Investments gave to The Cambridge Company its demand non-interest bearing note for $2,540,000. (5) Alert purchased all of the assets of the L. B. Lockwood Co. for $960,000. In return therefor Alert Investments gave to L. B. Lockwood Co. its demand non-interest bearing note in the amount of $960,000. (6) Morrison Brass Corporation, Limited, transferred $5,000,000 to Alert Investments and Alert Investments transferred all of the assets it had purchased from LCM Co., The Cambridge Company and L. B. Lockwood Co. to Morrison Industries, Inc., hereinafter referred to as Morrison Industries, a wholly-owned subsidiary of Morrison Brass Corporation, Limited. (7) Alert Investments purchased 1,250,000 shares of common stock of Morrison Brass *160 Corporation, Limited, from Acme Subdivision, Limited, for $5,000,000. (8) Acme Subdivisions, Limited, repaid the $5,000,000 loan to The Bank of Nova Scotia. A new note of Alert Investments dated May 7, 1956, was substituted for the demand note payable to LCM Co. The new note was also in the amount of $1,500,000, without interest, and was payable at the Union Bank of Commerce, Cleveland, Ohio, on May 7, 1958. Shiah M. Arsham was a stockholder of Alert Investments and took an active part in the transaction. The total outstanding stock of Morrison Brass Corporation, Limited, was a little less than a million and a half shares. The principal asset of Alert Investments was the stock of Morrison Brass Corporation, Limited, and its liabilities were the notes held by LCM Co., The Cambridge Company and L. B. Lockwood Co. By March 15, 1957, Albert acknowledged that the notes of Alert Investments given to LCM Co. and The Cambridge Company were worthless. On July 18, 1958, a new note was issued by Alert Investments for the note payable to LCM Co. due May 7, 1958. This note, due July 18, 1960, was turned over to the Internal Revenue Service by Albert to apply on the income tax liability *161 of LCM, Inc.
Officers of the Internal Revenue Service wrote immediately to Alert Investments to advise it of the assignment; however, this letter was returned as undeliverable. No payment of principal or interest has been made on the note. On September 12, 1958, officers of the Internal Revenue Service offered to return the note to Albert to permit him to collect on it. This offer was rejected and Albert has never attempted to enforce the Alert Investments' obligation. Again in 1961, Internal Revenue Service officers sought to collect on the Alert Investments' note but were unable to contact Alert Investments. No correspondence has been maintained between Morrison Brass Corporation, Limited, and its wholly-owned subsidiary, Morrison Industries. However, Holland, who became vice president and general manager of Morrison Industries, has consulted with Albert with respect to the operations of Morrison Industries. On June 27, 1956, LCM, Inc. sold all of its real property to National Distillers, Inc., a corporation not related to it, for a total sales price of $1,815,000. The proceeds of the sale were distributed as follows: To General Service Administration
(to retire mortgage on the real
estate)
$260,288.81
To title insurance
1,540.00
to property taxes
11,742.58
To Associates Discounts, Inc.
970,487.31
To Broad Street Bank, Trenton,
New Jersey
570,941.30
Total
$1,815,000.00
*162 On October 31, 1955, the liabilities of Machinery Terminals, exceeded its assets by over $65,000. The payment of $970,487.31 made to Associates Discounts, Inc. was made for the benefit of Machinery Terminals, and was applied to reduce the balance of an obligation from Machinery Terminals to Associates Discounts. At or after the time of this payment, Machinery Terminals executed a note payable to LCM, Inc. in the amount of $970,487.31. The transaction was recorded on the books of Machinery Terminals as a credit to "Loan-Lake City Malleable Co." Machinery Terminals has made no payments of either principal or interest on the note. The note executed by Machinery Terminals was turned over to the Internal Revenue Service to apply on the income tax liability of LCM, Inc. A collection officer of the Internal Revenue Service, attempting to collect the note, could not discover any assets or even the business location of Machinery Terminals. An offer to return the note to Albert for collection was rejected. The funds totalling $570,941.30 deposited in the Broad Street Bank, Trenton, New Jersey, were credited to the account of LCM, Inc. at that bank. However, LCM, Inc. did not record in *163 its own books either this deposit or withdrawals subsequently made from this account, since the account was not carried on the ledgers of LCM, Inc.
The following disbursements were made from the Broad Street Bank account: Shiah Arsham
$ 75,000.00
Seaside Vending Company
15,000.00
Tradesmen's Bank
100,000.00
L. Albert & Son
179,500.00
To Albert-controlled corporations: Lake City Malleable Co.
$85,000
Albert-Harris, Inc.
50,000
Bellanca Corp.
30,000
Biggs Boiler Company
11,500
176,500.00
Miscellaneous and unidentified
22,765.12
Total disbursements
$568,765.12
Balance at 10/31/56
2,176.18
Total received from Lake City
Malleable, Inc.
$570,941.30
The Tradesmen's Bank upon receipt of the $100,000, issued a certificate of deposit to Albert on July 5, 1956 in the amount of $100,000. The certificate was retained by the bank as security for two loans which the Tradesmen's Bank had made to Albert in 1955 in the total amount of $300,000. On August 3, 1956, the certificate of deposit was applied to Albert's loan. Albert had a 90-percent interest in the partnership of L. Albert & Son. The remaining 10-percent interest was owned *164 by his wife Estelle B. Albert. L. Albert & Son recorded $177,000 of the $179,500 disbursed to it as a credit to an account entitled "Lake City Malleable Co." which account has been inactive since November 1956. The amounts received by Albert-Harris, Inc. aggregating $50,000 were recorded as credits to an account entitled "Loans payable - Sydney L. Albert and/or Companies." Albert owned 50 percent of the stock of Albert-Harris, Inc. which is now bankrupt. In 1956, Albert was the controlling shareholder and president of Bellanca Corp. and also owned Biggs Boiler Co.
On October 2, 1956, LCM, Inc. sold all of its personal property at auction for a total consideration of $362,411.73. The funds realized upon the sale were disposed of as follows: Deposited in First National Bank,
Akron, Ohio
$263,411.73
To Babcock Printing Press Company
40,000.00
To Seaside Vending Company
39,000.00
To Commercial Bank, Ashtabula
(being the commercial bank ac-
count of Lake City Malleable,
Inc.)
20,000.00
$362,411.73
Albert was the controlling shareholder in Babcock Printing Press Company and the $40,000 it received from LCM, Inc. was recorded on its books as a debit to *165 cash and a credit to loans payable. On June 23, 1959, Babcock Printing Press Company was adjudicated a bankrupt in the United States District Court for the Northern District of Ohio. LCM, Inc. has not been listed as a creditor in this proceeding, nor has it filed a proof of claim. Lcm c/o. has been listed as a creditor in the amount of $154,500, consisting of monies advanced by LCM Co. to the bankrupt. The funds transferred to the First National Bank of Akron were deposited to the credit of an account standing in the name of LCM Co. The disbursements made from this account were made to the following payees: Lake City Malleable Company
$ 75,000.00
Lockwood Company
5,000.00
Philip E. Albert
20,650.00
First National Bank
57,500.00
Sydney L. Albert
33,000.00
To Albert-controlled corporations: Albert-Harris, Inc.
$ 9,300
Biggs Boiler Company
6,500
Babcock Printing Press
Company
15,000
$ 30,800.00
$221,950.00
Miscellaneous and unidentified
40,416.32
$260,366.32
Increase in balance in account
10/31/56
$3,653.77
10/ 1/56
608.36
3,045.41
Total received from Lake City Mal-
leable, Inc.
$263,411.73
The distribution *166 of the sales proceeds realized by LCM, Inc. upon the sales of its real property and personal property described above were reflected on its books as follows: Debit the following: Account No. 314 Suspense
$1,526,428.61
Special Account Receivable, No. 316
354,500.00
Accrued Taxes
11,742.58
Accrued Interest
5,131.51
Mortgage payable
127,000.00
Mortgage payable - current portion
128,000.00
Interest expense
157.30
Reserve for depreciation
539,967.74
Accounts receivable - trade
38,911.73
Revenue stamps
1,540.00
Credit the following: Sale of fixed assets
1,800,000.00
Machinery and equipment
883,950.18
Profit and loss on sale
27,637.06
Sales
21,292.22
Under date of July 1, 1956, LCM Co. issued its note to LCM, Inc. for $300,000 payable 5 years from date with interest at 3 percent. LCM Co. issued another note payable to LCM, Inc. on July 1, 1956, for $125,000 due 3 years from date with interest at 3 percent. Subsequently, on September 10, 1956, LCM Co. issued still another note payable to LCM, Inc. for $94,000 due 2 years from date, with interest at 3 percent. Neither Albert nor Holland recalls the specific purpose for which the 3 notes were *167 issued, and no payments of either principal or interest have been made on any of the notes. The 3 notes were turned over by Albert to the Internal Revenue Service to apply on the income tax liability of LCM, Inc. Request for payment was made by Internal Revenue Service officers on September 11, 1958, a day after the note for $94,000 was due; however, they were advised that no funds were available for payment. An offer to return the 3 notes to Albert for collection was rejected. A further request for payment in 1961 was refused because of lack of funds. On October 31, 1956, the end of the fiscal year of LCM, Inc., its balance sheet was as follows: Assets: Cash
$ 18,670.62
Accounts payable debit bal-
ances
6,574.05
Trade accounts receivable, ac-
counts receivable discounted
and employees' accounts re-
ceivable
31,344.40
Prepaid expenses and supplies
12,067.16
Machinery and equipment
129,662.06
$ 198,318.29
Suspense
1,576,428.61
Special accounts receivable
407,200.00
Other intercompany accounts
(37,762.40)
Total assets
$2,144,184.50
Liabilities and capital: Accounts payable
$ 9,161.42
Accrued expenses
5,776.76
Accrued Federal income tax
316,393.36
Total liabilities
$ 331,331.54
Capital stock
1,500,000.00
Earned surplus (deficit)
(885,424.93)
1956 profit
1,198,277.89
Total liabilities and capital
$2,144,184.50
*168 In an amended return filed by LCM, Inc. for the year ended October 31, 1956, the "Machinery and Equipment" account was written down from $129,662.06 to $3,188.76 which represented saleable machinery. The "Suspense" and "Special Accounts Receivable" accounts have been inactive since November 1956. The balance sheet of LCM Co. on October 31, 1956 was as follows: Assets: Cash
$ 4,653.77
Due from affiliated companies
1,380,039.11
Intercompany accounts
76,361.58
Investment in subsidiaries
1,620,481.84
Total assets
$3,081,536.30
Liabilities and capital: Accrued Federal income tax
$ 86,560.35
Intercompany accounts payable
1,122,603.93
Total liabilities
$1,209,164.28
Capital stock
5,000.00
Capital surplus
207,184.76
Treasury stock
(37,387.50)
Earned surplus
1,697,574.76
Total liabilities
$3,081,536.30
On or about June 30, 1957, LCM Co. filed a Corporation Return of Taxable Property for 1957 with the Cuyahoga, Ohio, County Auditor, on behalf of itself and its subsidiaries, LCM, Inc. and the Columbus Malleable Iron Co. In this return, signed by Holland, the company represented that the intercompany accounts receivable were worth not more than *169 $500,000. This reduction in value was sufficient to reduce the company's property tax to a negligible amount. LCM, Inc. filed its return for the year ended October 31, 1956 on April 15, 1957. In this return LCM, Inc. reflected the sales of its real estate and personal property and reported an income tax liability of $316,393.36. However, no payment accompanied this return and to date no payments have been made toward the retirement of this liability. Although the return of LCM, Inc. was due to be filed on or before January 15, 1957, it requested a 90-day extension of time for filing and with this request filed a tentative return. However, it did not seek or secure the permission of the Commissioner to delay the payment of the tax liability. LCM Co. did not file a return for its fiscal year ended October 31, 1956. The Commissioner determined that the gain from sales of tools, equipment and maintenance supplies by LCM, Inc. during the year ended October 31, 1956, was long-term capital gain and not ordinary income as reported by LCM, Inc.
The Commissioner also determined that LCM, Inc. was liable for an addition to tax under section 6651(a), Internal Revenue Code *170 of 1954 for failure to file its return on or before the date prescribed by the statute. The Commissioner determined that $1,883,840.34 of the proceeds of the sales by LCM, Inc. was disbursed without adequate consideration to or for the benefit of LCM Co. and interests related to it, without adequate provision having been made for the payment of the federal income tax liability of LCM, Inc.; and that LCM Co. by virtue of its status as sole owner of all the stock of LCM, Inc. was the actual or constructive transferee of these dispositions and is therefore liable for the unpaid income tax liability. The Commissioner determined that the proceeds of the sales by LCM, Inc. were within the immediate personal control of Albert; that he permitted $1,883,840.34 to be disbursed, without adequate consideration, to himself or entities in which he held controlling interest, without provision having been made for payment of the federal income tax liabilities of LCM, Inc.; and that by virtue of the transfers he is liable as transferee and as transferee of a transferee of LCM, Inc.
The Commissioner determined that $970,487.31 of the proceeds of the sales by LCM, Inc. was disbursed, without adequate *171 consideration, for the direct benefit of Machinery Terminals; that other amounts aggregating $913,353.03 were disbursed, without adequate consideration, to or for the benefit of interests related to Machinery Terminals; that no provision was made by LCM, Inc. for payment of its federal income tax liabilities; and that Machinery Terminals, by virtue of its status as a direct beneficiary of $970,487.31 and as constructive owner of all of the stock of LCM, Inc., is liable as transferee and as transferee of a transferee for the unpaid tax and addition to tax due from LCM, Inc.
The Commissioner determined that Albert-Harris, Inc. acquired as part of a related series of transfers and without payment of adequate consideration, various assets of LCM, Inc.; that LCM, Inc. was unable to meet its liability for federal taxes and addition to tax; that the related series of transfers through which Albert-Harris, Inc. acquired assets of LCM, Inc. was a sham and in fraud of creditors; and that Albert-Harris, Inc. is liable as transferee of LCM, Inc. in the amount of $38,000 plus interest. The Commissioner determined that Morrison Industries, Inc. as part of a related series of transfers and without *172 payment of adequate consideration, acquired various assets of the LCM Co.; that LCM Co. was unable to meet its liability as transferee for income tax and addition to tax due from its wholly-owned subsidiary, LCM, Inc.; that the related series of transfers through which Morrison Industries acquired the assets of LCM Co. was a sham and in fraud of creditors; and that Morrison Industries, having secured possession of the physical assets of LCM Co., is therefore liable as transferee. Opinion Petitioner LCM, Inc. filed an income tax return for its taxable year ended October 31, 1956, showing tax liability of $316,393.36. No payment of this amount has been made. The petition filed by LCM, Inc. presented a claim for overassessment based on an amended return filed under the provisions of section 337 of the Internal Revenue Code of 1954, providing for non-recognition of gain resulting from the sale of assets pursuant to a qualified plan of liquidation. However, no proof was presented by the petitioner to support this affirmative claim and on brief the petitioner abandoned its claim. Therefore, the issue is not presented for decision here. The Commissioner determined *173 a deficiency in income tax with respect to LCM, Inc. of $5,323.06 for the year ended October 31, 1956, on the ground that gains realized on the sale of tools, equipment and maintenance supplies in the amount of $21,292.29 constituted long-term capital gain rather than ordinary income as reported by LCM, Inc. Petitioner LCM, Inc. has the burden of proof with respect to this issue and has introduced no evidence to support its assignment of error. Therefore, we hold that the Commissioner is correct in his determination of a deficiency of $5,323.06 in LCM, Inc.'s 1956 tax liability. In regard to this deficiency, the Commissioner determined that petitioner LCM, Inc. was also liable for an addition to tax under section 6651(a) of the Internal Revenue Code of 1954[1] in the amount of $798.46 (15 percent of the deficiency) for failure to file its return on or before the date prescribed by statute. The income tax return of LCM, Inc. for the year ended October 31, 1956, was due to be filed on January 15, 1957. LCM, Inc. requested a 90-day extension of time for filing and with this request filed a tentative return. The return was subsequently filed on April 15, 1957, but *174 no payment accompanied the filing. There is no evidence that the request for an extension was granted and the face of the return itself bears the statement "No extension granted." The mere making of a request for an extension of time in which to file, without other facts, cannot of itself be said to constitute reasonable cause for the delay. The provision for automatic extension in the case of corporations, section 6081(b) of the Internal Revenue Code of 1954 n2 is not applicable since no payment on the income tax liability has been made and LCM, Inc. did not seek or secure the permission of the Commissioner to delay the payment of the tax liability. Cf. Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956) affd. 254 F. 2d 51 (C.A. 7, 1958). There is no other evidence regarding the delay. Petitioner LCM, Inc. has not met its burden of proof of reasonable cause for the delay in filing its return and has made no argument on brief in support of its assignment of error. The issue regarding the applicability of an addition to tax under section 6651(a) of the Internal Revenue Code of 1954 is decided for the Commissioner. *175 *176 The total unpaid tax liability of LCM, Inc. for the taxable year ended October 31, 1956, is thus as follows: Assessed
Tax
$316,393.36
Addition to tax
47,459.00
Deficiency
Tax
5,323.06
Addition to tax
798.46
$369,973.88
The real matter at issue in this proceeding is the correctness of the Commissioner's determination of transferee liability against the petitioners other than LCM, Inc. [3] The Commissioner determined that LCM Co., Machinery Terminals, Albert-Harris, Inc. and Albert were liable as transferees of LCM, Inc. The Commissioner further determined that Morrison Industries, Machinery Terminals, and Albert were liable as transferees of transferee LCM Co. The burden of proof with respect to this issue is with the Commissioner. Section 6902(a) of the Internal Revenue Code of 1954. *177 The fortunes of LCM Co. and its two subsidiaries, LCM, Inc. and Columbus Malleable Iron Co., were under the direction and control of Albert, who describes himself as a "business entrepreneur" and who has controlled approximately 200 corporations. In 1956, Albert decided to liquidate these three corporations. On April 1, 1956, Columbus Malleable Iron Co. sold all of its assets and disposed of the proceeds in April and June of 1956. On October 31, 1956, the end of its fiscal year, Columbus Malleable Iron Co.'s assets consisted of two accounts, "Due from affiliated companies" and "Inter company accounts," with debit balances aggregating $1,480,070.62. It did not file a federal income tax return for fiscal year 1956. Pursuant to the liquidation, LCM Co. disposed of all its operating assets in a series of closely related transactions which occurred May 7, 1956 in Toronto, Ontario. As a net result of these transactions, Morrison Industries, one of the petitioners here, obtained the operating assets of LCM Co. as well as the assets of The Cambridge Company (another Albert enterprise) and L. B. Lockwood Co. (owned by Shiah Arsham and his cousins). Morrison Industries was a whollyowned *178 subsidiary of Morrison Brass Corporation, Limited, a Canadian corporation. As a result of the transaction in Toronto, 1,250,000 shares out of a total of approximately 1,500,000 shares of common stock of Morrison Brass Corporation, Limited, came to be held by Alert Investments, another Canadian corporation. Alert Investments gave its notes for $1,500,000 payable to LCM Co., $2,540,000 payable to The Cambridge Company, and $960,000 payable to L. B. Lockwood Co. in payment for the assets. In other words, LCM Co. surrendered its operating assets to Morrison Industries in exchange for a note from Alert Investments, which owned most of the stock of Morrison Brass Corporation, Limited, which in turn wholly owned Morrison Industries. LCM Co.'s balance sheet on October 31, 1956, the end of its fiscal year, showed assets of only $4,653.77 other than substantial amounts listed as "Due from Affiliated Companies," "Inter Company Accounts" and "Investment in Capital Stock of Subsidiaries." Its liabilities included accrued federal income tax in the amount of $86,560.35. LCM Co. did not file a return for its fiscal year ended October 31, 1956. Also pursuant to the plan of liquidation, LCM, Inc. *179 sold all of its real property on June 27, 1956, for $1,815,000. By October 31, 1956, the end of LCM, Inc.'s fiscal year, virtually all of the proceeds of this sale had been distributed directly or indirectly through an account in the name of LCM, Inc. in the Broad Street Bank, Trenton, New Jersey. A total of $273,571.39 was paid for a mortgage, taxes and insurance on the real property. The following unexplained distributions were made: Shiah Arsham
$75,000.00
Seaside Vending Co.
15,000.00
Misc. and unidentified (through Broad
Street Bank account)
22,765.12 The balance in the Broad Street Bank account was $2,176.18. The bulk of the proceeds was distributed to Albert or to other Albert enterprises or for their benefit in the following amounts: Tradesmens Bank (certificate of de-
posit applied on August 3, 1956
to loan to Albert)
$ 100,000.00
L. Albert & Son
179,500.00
Machinery Terminals (Paid to As-
sociates Discounts, Inc. to reduce
balance on obligation from Ma-
chinery Terminals to Associates
Discounts)
970,487.31
LCM Co.
85,000.00
Albert-Harris, Inc.
50,000.00
Bellanca Corp.
30,000.00
Biggs Boiler Co.
11,500.00
Total
$1,426,487.31
*180 Continuing its liquidation, LCM, Inc. on October 2, 1956, sold all of its personal property at auction for a total sales price of $362,411.73. Of this amount, $39,000 was distributed to Seaside Vending Company and $20,000 was placed in the bank account of LCM, Inc. in the Commercial Bank of Ashtabula. The remaining $303,411.73 was distributed to two Albert-controlled corporations. Babcock Printing Press Company received $40,000. $263,411.73 was deposited in the First National Bank, Akron, Ohio, in an account standing in the name of LCM Co., LCM, Inc.'s parent corporation. As noted in the findings of fact, this sum was rapidly disbursed so that on October 31, 1956, only $3,045.41 of the amount remained in LCM Co.'s account. The distribution of the proceeds from the sale of its real and personal property, other than the $273,571.39 paid for the mortgage, interest, and taxes on the real property, was entered on the books of LCM, Inc. as debits to a "Suspense" account and accounts receivable. Of these accounts, a total of $1,729,899.04 has been identified as being amounts distributed to Albert and to related enterprises or for their benefit. The balance sheet of LCM, Inc. on October 31, 1956, the *181 end of its fiscal year, shows total assets of $2,144.184.50, including a "Suspense" account and accounts receivable reflecting the proceeds of the sale of its property as well as other items. A "Machinery and Equipment" item is listed at $129,662.06. However, in an amended income tax return filed by LCM, Inc. for the fiscal year 1956, that item was reduced accurately to reflect the value of the retained machinery as $3,188.76. The balance sheet shows total liabilities (exclusive of capital) to be $331,331.54, including an item for accrued federal income tax of $316,393.36. Some of the parties receiving distributions from LCM, Inc. were shown to have recorded the amounts received by them as accounts payable. In addition, LCM, Inc. held three notes totaling $519,000 from LCM Co. and a note for $970,487.31 from Machinery Terminals. Our first concern is whether or not the distributions of the proceeds of the sale of LCM, Inc.'s real and personal property were voluntary transfers without valuable consideration and whether LCM, Inc. was thereby rendered insolvent. The Commissioner contends that this is so, arguing that the bookkeeping entries were mere cover for a final liquidation *182 and distribution of all assets. The Commissioner seeks to follow these assets into the hands of transferees to satisfy LCM, Inc.'s tax liabilities. [4]
Petitioners take the position that the distribution of assets by LCM, Inc. was made for full and adequate consideration and that the notes *183 and accounts receivable were bona fide and valid and that therefore LCM, Inc. was not rendered insolvent by its conveyances. Petitioners point to the existence of the notes and accounts as showing the existence of binding debtor-creditor relationships. The extremely complicated facts and circumstances surrounding Albert's operations and the liquidation of LCM Co. and its subsidiaries lead us to agree with the Commissioner that the assets of LCM, Inc. were voluntarily transferred, at least in so far as the proceeds of the sale of its property were distributed to or for the benefit of Albert and related enterprises. A pattern is apparent in the manner in which the affairs of Columbus Malleable Iron Co., LCM Co. and LCM, Inc. were wound up. Although there was no formal dissolution of the affiliated corporations, they were rapidly and completely stripped of their tangible assets and left as empty and inactive shells. Each was left almost solely with "paper assets" of amounts due it, which have proved to be worthless. The liquidation of the three corporations took place during the fiscal year ended October 31, 1956. Despite large accounts receivable appearing on the balance sheets *184 as of that date, a Corporation Return of Taxable Property of LCM Co. and its subsidiaries filed with the Cuyahoga, Ohio County Auditor as soon thereafter as June 30, 1957, acknowledged the worth of intercompany accounts receivable as being not more than $500,000. On the basis of this return the property tax was negligible. The amounts due LCM, Inc. and Columbus Malleable Iron Co. were virtually all due from other Albert enterprises. These accounts were but a part of an elaborate structure of intercompany accounts involving these enterprises as well as others of his companies. Incomplete and inadequate records of the enterprises and transactions have been kept and Albert and his employees have been unable or unwilling to help untangle the maze. Albert's own accountant testified that, despite effort on his part extending over several years, he had been unable to reconcile the books and records of LCM, Inc. and related companies or to reconcile intercompany accounts. Albert testified he had no hesitancy about "lending" assets between his enterprises. It is evident that Albert operated his companies as a sole proprietorship, freely shuffling assets as he desired without regard to the *185 various corporate entities and without keeping complete and accurate records. Close examination of the notes and accounts receivable from the related enterprises reveals a nebulous quality about the obligations themselves. All of the "loans" are unsecured. The bulk of the amounts involved was entered in a "suspense" account. Only the notes executed by LCM Co. purport to pay any interest. On October 31, 1955, not long before LCM, Inc. accepted its note for $970,487.31, Machinery Terminal was insolvent, with its liabilities exceeding its assets. No party to the transaction was able to testify regarding the specific circumstances and consideration behind the execution of the three notes given LCM, Inc. by LCM Co.
Disregarding the niceties of corporate entities, as he himself was wont to do, Albert was in fact both the "lender" and the "borrower" on all the purported obligations running to LCM, Inc. from the parties he controlled. Enforcement of the obligations would amount to enforcing obligations against himself. The obligations are thus illusory, since no account and no note would be enforced except as Albert chose to do so against his own interests. Since the liquidation of LCM, *186 Inc.'s tangible assets, the corporation has been completely inactive and Albert has undertaken no action to collect any of the money purportedly due it. The notes have been turned over to Internal Revenue Service officers to apply on LCM, Inc.'s tax liability. Despite what would appear to be a large equitable interest in the notes, Albert refused to offer to return the notes to him for collection. We are convinced from the facts before us that Albert totally liquidated LCM, Inc. and appropriated the bulk of its assets to himself and to his other businesses. As seen, Albert regarded the assets of LCM, Inc. as being a part of his personal proprietorship, available for whatever purpose he wished and without particular regard for the ultimate status of the transferor. To the extent that the conveyances of LCM, Inc.'s assets were recorded as loans to related businesses, we believe the facts and circumstances show them to be sham transactions without real substance. The obligations were nebulous and unsecured. Of greater significance was Albert's unique position on both sides of the obligations. They could only be enforced by the same hand that would have to pay them. Enforcement on behalf *187 of LCM, Inc., which had been liquidated and was completely dormant, against the parties using those assets, would not be to Albert's best interests. We are convinced that no binding debtor-creditor relationships were intended or were created between these related interests. Central Nat. Bank v. Walterscheid, 204 Mo. App. 179; 222 S.W. 912 (1920). The so-called "loans" were without substance and the obligations illusory. Petitioners contend that the obligations on the books of the parties and the notes are evidence of valuable consideration given for LCM, Inc.'s assets. Although the transactions appear legal on their face, when considered together they point conclusively to an intention to let LCM, Inc. come to a pauper's grave. W. T. Price, Inc. (DC, SD., Fla. 1942). We are not bound by bookkeeping entries, Helvering v. Midland Mutual Life Ins. Co., 300 U.S. 216 (1937). Through his domination of the parties, Albert was responsible for the treatment of these transactions on the books of the parties. He was in a position subsequently to acknowledge the entries, as he attempts here, or not, as the situation dictated. In similar situations *188 involving transactions between related taxpayers, this Court has held that the treatment of withdrawals from a corporation as loans on the books of the corporation or the mere issuance of notes cannot give color to an otherwise sham transaction. Ben R. Meyer, 45 B.T.A. 228 (1941), William C. Baird, 25 T.C. 387 (1955). [5]
*189 The voluntary transfer of the bulk of the proceeds of the sale of all its tangible assets to Albert and Albert related enterprises rendered LCM, Inc. insolvent. The total amount of such identifiable voluntary transfers has been shown to be $1,729,899.04. This amount was included on LCM, Inc.'s books and balance sheet within a "Suspense" account and various accounts receivable. When the balance sheet assets as of October 31, 1956, the end of LCM, Inc.'s fiscal year, are reduced by the amount of the identified voluntary transfers and reduced to reflect the actual value of retained machinery, the remaining assets are inadequate to meet its acknowledged accrued federal income tax liability. Furthermore, although we are convinced on the facts presented by the Commissioner that LCM, Inc. was rendered insolvent by the series of transfers to related interests, since the Commissioner has shown that voluntary transfers were made, and that tax liability accrued during the year of the transfers, the petitioners have the burden of proof regarding the solvency of the transferor, Leon Papineau, 28 T.C. 54 (1957); *190 Meyer Fried, 25 T.C. 1241 (1956). LCM, Inc. was an Ohio corporation and the transfers of its assets took place in Ohio. The Ohio Supreme Court as long ago as Oliver v. Moore, 23 Ohio St. 473 (1872), at 480, announced the rule that: the burden of showing the solvency of * * * (the transferor) at the time he paid the mortgage debt, in order to uphold the gift, as against the plaintiff, who was then a creditor, rested upon the defendants. The same rule is still applicable in Ohio, 25 Ohio Jurisprudence 2d (1957) 584. Aside from the illusory accounts payable from Albert and related enterprises, petitioners have failed to show the value of any other assets adequate to have paid LCM, Inc.'s liabilities. There is no question that all of the transfers made from June 27, 1956 to the end of LCM, Inc.'s fiscal year on October 31, 1956 were made pursuant to a plan to liquidate the assets of LCM, Inc. Although the transferor was undoubtedly solvent at the time some of the individual transfers were made, it is established law that where insolvency results from a series *191 of related transfers, some of which may have occurred before actual insolvency, the transferees under all the transfers are liable for the debts of the transferor. Borall Corporation v. Commissioner, (C.A. 2, 1948) 167 F. 2d 865, affirming a Memorandum Opinion of this Court; Otto C. Botz, 45 B.T.A. 970 (1941), affd. 134 F. 2d 538 (C.A. 8, 1943); Aurore B. Benoit, 25 T.C. 656 (1955), remanded on another issue 238 F. 2d 485 (C.A. 1, 1956). The tax liability of the transferor, LCM, Inc., is for the fiscal year ended October 31, 1956. The transfers in question took place between June 27, 1956 and the end of the fiscal year and the bulk of the liability accrued as the result of such transfers. The liability of the related party transferees cannot be avoided merely because the amount of tax has not been determined or assessed at the time of the transfers; it is sufficient here that the liability accrued during the taxable year in which the transfers took place and largely as a result of them. J. Warren Leach, 21 T.C. 70 (1953); *192 Powers Photo Engraving Co., 17 T.C. 393 (1951), remanded on another issue 197 F. 2d 704 (C.A. 2, 1952); R. E. Wyche, 36 B.T.A. 414 (1937). Petitioners concede that the Commissioner has employed due diligence in attempting to collect the tax liability directly from transferor. Petitioners argue, however, that the Commissioner was negligent in not taking proper formal steps to collect on the obligations due LCM, Inc. The notes from LCM Co. and Machinery Terminals were turned over to officers of the Internal Revenue Service; we hold that they have made reasonable effort to collect those notes. No assets or even any business location of Machinery Terminals could be found. LCM Co. is insolvent, its only "asset" being a worthless $1,500,000 note from Alert Investments. We are not disposed to require procedures involving idle formalities under the facts before us. Ethel Hamilton Nau, 27 T.C. 999 (1957), affd. 261 F. 2d 362 (C.A. 6, 1958). See also 9 Mertens, Law of Federal Income Taxation, sec. 53.29, and cases cited therein. It might also be noted that of the other transferees of LCM, Inc., both Albert-Harris and Babcock *193 Printing Press Company were shown to be bankrupt. On the facts before us, the Commissioner has established a prima facie case of transferee liability against LCM Co., Machinery Terminals, Albert-Harris, and Albert. Petitioners, who were in the best position to introduce further facts regarding the liquidation of LCM, Inc., have introduced no evidence which rebuts the Commissioner's proof. Ethel Hamilton Nau, supra; Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). The $970,487.31 paid to Associates Discounts, Inc. to apply on an obligation owed it by Machinery Terminals was clearly paid for the benefit of Machinery Terminals. [6] This amount is greatly in excess of the transferee liability determined against it by the Commissioner. The $50,000 transferred directly to Albert-Harris is likewise greater than the $38,000 transferee liability determined against it. LCM Co. has *194 been shown to have received transferred assets of $85,000 from the proceeds of the sale of LCM, Inc.'s real property and $263,411.73 (deposited in its bank account) from the proceeds of the sale of LCM, Inc.'s personal property, for a total of $348,411.73. As the sole shareholder, LCM Co. was entitled to receive or direct the distribution of LCM, Inc.'s assets upon liquidation. However, the liability of a transferee is based upon its having received assets and extends only to the extent that it actually shared in the assets of the transferor. Phillips v. Commissioner, 283 U.S. 589 (1931). Here it has not been shown that LCM Co. received any real or constructive benefit from the transferred assets other than from the amounts transferred directly to it. James M. Denton, 21 T.C. 295 (1953). Albert received the direct benefit of the $100,000 which was deposited in Tradesmens Bank and which was applied to his loan. He also shared in the $179,500 paid to or for the benefit of L. Albert & Son, a partnership in which he had a 90 percent interest. In addition, the transfers *195 from LCM, Inc. to corporations owned or controlled by him, constitute constructive transfers to Albert himself. To the extent of his equitable ownership of the corporate transferees, Albert received the benefit of these transfers. The situation is exactly the same as if the funds had first been paid over to Albert and then paid over to the corporations, thereby increasing his equity in them. In an analogous situation in Helvering v. Gordon, 87 F. 2d 663 (C.A. 8, 1937), the Court of Appeals held that where there were transfers of income from one corporation to another, both of which were wholly owned by individual taxpayers, the transfers were in effect taxable distributions from the first corporation to the individual shareholders. The court rejected the taxpayers' argument that they were not chargeable with income since they had never personally received the funds, saying, at page 667: It is not essential under the income tax laws that a taxpayer actually receive money to which he is entitled before he is required to include it in his income tax returns. Whenever it is available *196 to him and he is authorized to receive it or to direct its payment to some other party, it must be accounted for by him for income tax purposes. * * * The government cannot be controlled by the manipulations of the taxpayer's accounts, nor by the shifting of funds from one personally dominated corporation to another, in the enforcement of the tax laws. It is the Commissioner's duty to look through forms to substance and to assess the earnings of corporations to their shareholders in the year such earnings are distributed. See also Irving Sachs, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), cert. den. 81 S. Ct. 63 (1960); Byers v. Commissioner, 199 F. 2d 273 (C.A. 8, 1952) affirming a Memorandum Opinion of this Court, cert. den. 345 U.S. 907 (1953). We need not decide the exact extent to which Albert is a beneficial or constructive transferee of LCM, Inc.'s assets since it is clear that his total transferee liability is at least as great as the $369,973.80 determined against him by the Commissioner. The Commissioner next seeks to trace assets of LCM Co. into the hands of its alleged transferees, Morrison *197 Industries, Machine Terminals and Albert, in order to satisfy the tax liability determined against LCM Co. as a transferee of LCM, Inc. Albert caused LCM Co. to convey all of its operating assets on May 7, 1956. In their stead, a note from Alert Investments for $1,500,000 was substituted. It is clear that this assignment of assets was in liquidation of the corporation and a winding up of its affairs. There has been no activity in the corporation since 1956. The exchange of physical assets for accounts receivable is a part of the pattern already seen in the liquidation of the two subsidiaries of LCM Co.
An examination of LCM Co.'s financial standing on October 31, 1956, shows its listed assets to consist of investments in subsidiaries (which we have already found to be worthless since their only assets consist of illusory accounts receivable), items "Due from Affiliated Companies" in the amount of $1,380,039.11 (which we find illusory for the same reasons stated in regard to the affairs of LCM, Inc. above), "Intercompany Accounts" in the amount of $76,361.58 (equally illusory) and a small amount of cash which was insufficient to meet its obligations. The note for $1,500,000 from *198 Alert Investments does not readily appear to be reflected on the balance sheet. However, we will presume that, if valid, it constituted an asset. The crucial question thus is whether the note for $1,500,000 from Alert Investments constituted valuable consideration for the assets which were assigned by LCM Co. If so, as the petitioners maintain, there was no voluntary transfer of the tangible assets and LCM Co. retained assets more than sufficient to remain solvent. If not, as the Commissioner urges, the assets were voluntarily transferred and the transfer left LCM Co. insolvent and unable to meet its tax liability. The assets of LCM Co. were assigned in a series of related transactions which took place in Toronto, Canada, on a single date, May 7, 1956. It is apparent that these transactions were parts of an integrated plan and in fact constituted but one continuing transaction. The individual transactions may be of some significance; however, in the case of a series of obviously preplanned and inter-dependent dealings such as exists here, we must also look to the net effect of the various parts. Gregory v. Helvering, 293 U.S. 465 (1935). When the day of dealing *199 in Toronto had ended, LCM Co.'s assets had been assigned through Alert Investments to the Morrison Industries, subsidiary of Morrison Brass Corporation, Limited. Similar shifts through Alert Investments to Morrison Industries of all the assets of The Cambridge Company (also an Albert enterprise) and L. B. Lockwood Co. had taken place. The stock of L. B. Lockwood Co. was wholly owned by Shiah Arsham and his cousins, who had acquired half of their interest earlier in the year (1956) with funds provided by Albert. The bulk of the shares of Morrison Brass Corporation, Limited, and thus control of its affairs, passed to Alert Investments as its principal asset. Alert Investments' liabilities were three non-interest bearing notes totalling $5,000,000 to LCM Co., The Cambridge Company, and L. B. Lockwood Co. in exchange for the assets. The note to LCM Co. was unsecured; an original demand note was given but a note dated May 7, 1956 and due 2 years later was substituted. We are not aware of any corporate enterprise or activity on the part of Alert Investments other than the transactions reviewed above. We do know from the record that the affairs of the Morrison companies are now in the hands *200 of other parties and that officials of the Internal Revenue Service have been unable to locate Alert Investments and to collect on its note to LCM Co.
It can be ascertained that the principal assets of Morrison Brass Corporation, Limited, and its subsidiary, Morrison Industries, were those formerly held by LCM Co., The Cambridge Company, and L. B. Lockwood Co., since the vast majority of Morrison Brass Corporation, Limited stock was exchanged for the assets. Albert testified that he had no interest in Alert Investments, the Morrison companies, or the assets of LCM Co. and The Cambridge Company after May 7, 1956 and that the failure of Alert Investments to pay its obligations was just a bad business gamble. Albert, and Charles Holland, who was vice president of LCM Co. and continued as vice president of Morrison Industries, were unable or unwilling to testify to all details or produce complete records of the companies and transactions involved in this proceeding. Shiah Arsham, who was instrumental in these transactions and who was called as a witness by the Commissioner, refused to testify regarding Alert Investments, claiming the constitutional privilege against self-incrimination. *201 No records of Alert Investments, other than a few pages of the corporate minutes found by an Internal Revenue Service officer in the joint office of LCM Co., LCM, Inc. and Morrison Industries are available for our scrutiny. George R. Gardner, president of Morrison Brass Corporation, Limited, did not appear as a witness despite the Commissioner's request for his presence. He resides in Canada and is not subject to the subpoena powers of this Court. The transfer record book of Morrison Brass Corporation, Limited, was in the hands of the Montreal Trust Company which would not release it. However, we believe that the outline of these dealings, as set out above, speaks louder than the words - or lack of them - which we have heard. All of the assets of LCM Co. and The Cambridge Company, both clearly under the control of Albert, supplied the great bulk of the assets that went into the Alert Investments-Morrison Brass-Morrison Industry structure. In addition, half of the control which Shiah Arsham and his cousins exerted over L. B. Lockwood Co. had been purchased with funds supplied by Albert. Albert's stake in all these assets was great. It is obvious that, as chief benefactor, he would *202 also have a great interest in the future and fortunes of the assignee corporations which had their existence chiefly through possession of these assets. His acceptance in exchange for the assets of large, unsecured and non-interest bearing notes running from Alert Investments, which did not even retain title to the assets, is not commensurate with his stake. Although the form and instruments of legitimate sale were used, we are struck by the fact that the net result of all of these dealings was the creation of a new corporate structure composed almost entirely of all the assets of several corporations which had been under the control of Albert. The assets had merely been recast into an elaborate new chain which included several links outside the United States. Shiah Arsham, who had previously been associated with Albert at least to the extent of receiving funds so that he and his cousins might obtain 100 percent control of L. B. Lockwood Co., was a stockholder of Alert Investments and was instrumental in the transactions, here. Later, as has been noted, he received $75,000 upon the liquidation of LCM, Inc. *203 The illusory nature of a transaction cannot, of course, be established by the subsequent fact that an obligation proved worthless. However, subsequent actions in regard to an obligation are relevant in determining the nature of the transaction which gave rise to it. As early as March 15, 1957, Albert stated the notes given by Alert Investments in May of 1956 to LCM Co. and The Cambridge Company were worthless. Despite the sizeable sums involved, he took no steps to enforce the obligations. The LCM Co. note for $1,500,000 was renewed twice and turned over to the Internal Revenue Service to apply on the tax liability of LCM, Inc. Notwithstanding what would appear to be a large equity over and above the tax liability, Albert has not been interested in attempting to collect on the note. We are convinced that the facts and circumstances surrounding the alleged sale of all the assets of LCM Co. amount to a prima facie showing that the transaction was a sham. Albert was in a position to continue his control over the assets which passed from LCM Co. and the mere giving of a large unsecured note does not, without more, give legitimacy to the transaction under these circumstances. Ben R. Meyer, supra; *204 William C. Baird, supra. It appears that the note was merely a ruse, like those given to LCM, Inc., to be used as Albert saw fit - such as turning it over to the Internal Revenue Service to "pay" tax liability. Petitioners argue that the Commissioner has failed to carry his burden of proof that the note from Alert Investments for $1,500,000 was not valid and valuable consideration, section 6902(a), Internal Revenue Code of 1954. We believe that petitioners misconceive the burden which the Commissioner must bear. The Commissioner need only make a prima facie showing of transferee liability; the burden of going forward with the evidence in rebuttal then is on the petitioners. Ethel Hamilton Nau, supra; Wichita Terminal Elevator Co., supra; Fada Gobins, 18 T.C. 1159 (1952), affd. 217 F.2d 952 (C.A. 9, 1955). We believe that the Commissioner has established the required prima facie case on the facts and circumstances which have been shown. We cannot be blinded by form or close our eyes to the *205 realities of the situation as they appear. The whole pattern of rapid and complete distribution of all the tangible assets of LCM Co. and its subsidiaries and the questionable nature of the obligations taken in exchange convinces us that distribution of the assets was made without regard to the status of the transferor corporations and that the paper obligations were mere window dressing for corporate shells left inactive and insolvent. Petitioner Morrison Industries argues that since it paid $1,500,000 for the assets belonging to LCM Co., it therefore gave full value and cannot be considered a voluntary transferee. We are unable to agree with this contention since, in our view of the Toronto transaction, the use of the cash borrowed from the Bank of Nova Scotia and repaid to it the same day was illusory. Morrison Brass Corporation, Limited, the parent company of Morrison Industries, did issue 1,250,000 shares of its common stock in the transaction. However, this did not constitute payment for the assets of LCM Co., or those of The Cambridge Company or L. B. Lockwood Co., since the shares were distributed, not to those corporations, but to Alert Investments. Cf. California Iron Yards Corp. v. Commissioner, 82 F. 2d 776 *206 (C.A. 9, 1936), affirming a Memorandum Opinion of this Court; Warner Collieries Co. of Delaware, 36 B.T.A. 54 (1937), affd. 107 F. 2d 1023 (C.A. 6, 1939). Since Morrison Industries came under the control of Alert Investments, and became virtually identical with it, as part of the over-all scheme, it cannot claim to have been a stranger to the part of the transaction whereby LCM Co. transferred its assets without valuable consideration. The value of the property transferred by LCM Co. to Alert Investments and hence to Morrison Industries as set by the parties themselves has been shown to be $1,500,000. Petitioners have not contested that valuation in this proceeding. This is well in excess of LCM Co.'s $348,411.73 liability as a transferee of LCM, Inc. It is established law that transferees are retroactively liable for taxes accruing to the transferor in the year of the transfer, even though such taxes are unknown or do not arise until after the transfer. Updike v. United States, 8 F. 2d 913 (C.A. 8, 1925), cert. den. 271 U.S. 661 (1926); *207 J. Warren Leach, supra; Powers Photo Engraving Co., supra.Here LCM Co.'s transferee liability accrued during the taxable year ended October 31, 1956, the same year in which the transfer of all its assets took place. Furthermore, LCM Co.'s transferee liability accured as part of the single plan of liquidation under which it also transferred its assets. Otto C. Botz, supra; Borall Corporation, supra; Aurore B. Benoit, supra.Therefore, there is no bar to following LCM Co.'s assets into the hands of its transferees to settle its transferee liability. Petitioners contend that when the note from Alert Investments became due on July 18, 1961 it was in the possession of the Internal Revenue Service, but that no demand for payment has ever been made and no suit for collection has ever been started. Petitioners therefore argue that the Commissioner has been delinquent and negligent in failing to make serious attempts at collection. As we have noted, Albert himself has regarded the note as uncollectible. Internal Revenue Service officers have been unable to contact Alert Investments. Under the circumstances, resort to *208 the courts of a foreign jurisdiction in order to attempt to enforce the obligation is not required. Cf. American Railway Express Co. v. Commonwealth, 190 Ky. 636 (1920), 228 SW 433, app. den. (1923), 263 U.S. 674; George M. Newcomb, 23 T.C. 954 (1955). We are satisfied that the Commissioner is not required to make further empty effort to collect the note. Ethel Hamilton Nau, supra. It follows from what we have said that Morrison Industries is liable for the unpaid taxes of LCM, Inc. in the amount of $348,411.73 as the voluntary transferee of LCM Co.
Machinery Terminals, the sole shareholder of LCM Co., has not been shown to have received any assets upon LCM Co.'s liquidation and therefore has sustained no liability as a transferee of LCM Co. James M. Denton, supra. Although we believe on the facts and circumstances before us that Albert did not completely give up his interest and perhaps his control in the assets transferred to Alert Investments and hence to Morrison Industries, we have not been shown facts from which we can ascertain the extent or exact nature of his benefit in those assets. However, it is apparent *209 from what we have said heretofore that Albert is liable as a direct transferee of LCM Co. for the $33,000 paid over to him and as a constructive transferee of amounts paid for his benefit to Albert-Harris, Inc., Biggs Boiler Co. and Babcock Printing Press Company from the First National Bank account standing in the name of LCM Co.
Decisions will be entered under Rule 50. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Lake City Malleable Company, Transferee, Docket No. 78203; Machinery Terminals, Inc., Transferee, Docket No. 78205; Albert-Harris, Inc., Transferee, Docket No. 78206; Sydney L. Albert, Transferee, Docket No. 78207; Lake City Malleable, Inc., Docket No. 84398.↩
1. SEC. 6651. FAILURE TO FILE TAX RETURN. (a) Addition to the Tax. - In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. n2 SEC. 6081. EXTENSION OF TIME FOR FILING RETURNS. (b) Automatic Extension for Corporation Income Tax Returns. - An extension of 3 months for the filing of the return of income taxes imposed by subtitle A shall be allowed any corporation if, in such manner and at such time as the Secretary or his delegate may by regulations prescribe, there is filed on behalf of such corporation the form prescribed by the Secretary or his delegate, and if such corporation pays, on or before the date prescribed for payment of the tax, the amount properly estimated as its tax or the first installment thereof required under section 6152, * * *↩
3. SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred (1) Income, Estate, and Gift Taxes. - (A) Transferees. - The liability, at law or in equity, of a transferee of property - (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * *
(h) Definition of Transferee. - As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee, and with respect to estate taxes, also includes any person who, under section 6324(a)(2), is personally liable for any part of such tax. [This provision of the Internal Revenue Code merely provides a procedure by which the government may collect taxes. Substantive liability is determined by state law in the absence of a lien. Commissioner v. Stern, 357 U.S. 39 (1958), United States v. Bess, 357 U.S. 51 (1958), construing the predecessor section 311, of I.R.C. 1939. Section 1335.02 of the Ohio Revised Code provides: Every gift, grant, or conveyance of lands, tenements, hereditaments, rents, goods, or chattels, and every bond, judgment, or execution, made or obtained with intent to defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the persons purchasing such lands, tenements, hereditaments, rents, goods, or chattels, is void. A conveyance of property without adequate consideration so that the grantor is left without sufficient assets with which to pay his debts is constructively fraudulent and within the scope and intention of the act although no actual fraud is intended. Jamison v. McNally, 21 Ohio St. 295↩.]
4. 9 Mertens, Law of Federal Income Taxation, sec. 53.06, p. 11 lists the elements necessary to impose liability in equity on a transferee as follows: (1) The transfer of property must be made during or after the period for which the liability in question has accrued; (2) The transferor must have been liable; (3) All reasonable efforts must have been made to collect the tax liability from the taxpayer before the proceeding against the transferee is commenced; (4) There must have been a transfer of assets having value to the transferee from the transferor or from some preceding transferee; (5) This transfer of assets must have left the transferor insolvent; and (6) The proceeding against the transferee must have been begun within the applicable period specified in the statute of limitations.↩
5. In the Meyer case, we were presented with a situation somewhat analogous to the case at bar. The taxpayers there made large withdrawals from a corporation which they controlled. The amounts were treated as loans on the books of the corporation and notes were given and the taxpayers even paid some interest and made some repayments of principal. Nevertheless, we held that the withdrawals constituted distributions to the taxpayers (p. 239): From the facts before us we are convinced that petitioners used their control of Limited to withdraw from Limited whatever funds they desired at such times and in such amounts as they chose, very much in the manner of a sole proprietor appropriating the proceeds of the business in which he is engaged to supply his personal needs and recording the transactions as charges to his personal account without any specific requirement for repayment, except if, as, and when he chose. * * * those accounts would never become due and payable except as and when the petitioners chose to render them so through the affirmative action of Limited, which they controlled.↩
6. Although LCM, Inc. paid the creditors of a related corporation, no consideration passed therefrom to LCM, Inc. Bennett v. Rodman & English, 2 F. Supp. 355 (1932), affd. 62 F. 2d 1064↩ (1932).