GROSS FAMILY TRUST, TRANSFEREE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gross Family Trust v. Commissioner
Docket No. 10145-85.
United States Tax Court
T.C. Memo 1988-56; 1988 Tax Ct. Memo LEXIS 56; 55 T.C.M. (CCH) 113; T.C.M. (RIA) 88056; February 18, 1988. Bernard G. Gross, Trustee, for the petitioner. Magda Abdo-Gomez, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined that petitioner is liable, as transferee of the assets of one of its co-trustees, Bernard Gross, in the amount of $ 82,769 in respect of that trustee's personal Federal income tax liability for 1980. Petitioner *57 does not challenge the deficiencies in and addition to tax against the transferor, but instead challenges the Commissioner's pursuit of it as the transferee of Bernard Gross. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner, Gross Family Trust (the trust), is a trust established on September 1, 1979, by Claire Gross, who funded it with $ 100,000 cash. Claire Gross and her son, Bernard Gross (Gross) are trustees of the trust. At the time the petition was filed in this case, both Claire and Bernard Gross resided in North Miami Beach, Florida. The beneficiaries named in the trust are the four children of Bernard Gross. In 1980 Gross was a licensed physician practicing medicine in Florida. He graduated from the University of Lausanne in Switzerland and received his license to practice medicine in 1960. He became Board certified to practice dermatology in 1965. During 1980 Gross practiced dermatology through Derma-Lift Salon, Inc. (Derma-Lift)Derma-Lift is "owned" by a person named Francis Maschek (Maschek). It is a small clinic which performs cosmetic procedures *58 and specializes in a nonsurgical procedure called the phenal face peel. The phenal face peel is an acid chemical peel of the face which is intended to remove wrinkles. It is, in essence, a type of face lift. Gross and Maschek each performed that procedure. Gross did so alone, and when Maschek did it Gross "supervised" him since Maschek was not a licensed physician. Gross' earnings from his activity with Derma-Lift took two forms. As an employee of Derma-Lift he received $ 14,500 in wages in 1980. In addition, he earned "consulting fees" from Derma-Lift. His arrangement with Maschek called for an equal division of the net profits of the company, and his share was euphemistically described as consulting fees. Thus, Derma-Lift paid $ 159,919.84 in 1980 for Gross' consulting services, which were computed to be equal to one-half of the net profits of the company for that year. Payment of Gross' $ 159,919.84 consulting fees for the year 1980 took the form of three separate checks, none of which showed Gross as the payee. Instead, two of the checks representing Gross' fees were made out to "River Shipping Corp." and one was made out to the "Gross Family Trust" as follows: Date
Amount
Payee
July 7, 1980
$ 85,000.00 River Shipping Corp.
July 22, 1980
5,000.00
River Shipping Corp.
November 14, 1980
69,919.84
Gross Family Trust  *59 Each of these checks constituted compensation to Gross for his services rendered to Derma-Lift. Both the two checks issued to "River Shipping Corp." and the check issued directly to the trust were used to purchase assets from River Shipping Corporation (River Shipping) for the trust. As hereinbefore noted, the beneficiaries of the trust were Gross' children. Under the trust instrument, the trustees, Claire and Bernard Gross, were given the "sole and exclusive discretion" to distribute principal or income of the trust "for the support, education and maintenance of the said beneficiaries". In addition, the trust principal is required to be distributed at the beneficiaries' 30th, 35th, and 40th birthdays. River Shipping, the entity to which two of the checks were issued, is a corporation which owns and operates freighters. It is controlled by Joey Teitelbaum. Gross has known Teitelbaum some 30 years since their junior high school days, and apparently had been doing some business with him before 1980. The payments made by Derma-Lift to River Shipping in 1980 were partial payments made in order for the trust to acquire a 50 percent interest in two freighters, the River Ark *60 and the River Rose, or entities holding such freighters. The $ 69,918.84 check issued to the trust was forwarded to River Shipping and was also used in partial payment for a freighter. The original $ 100,000 cash corpus of the trust was also paid to Teitelbaum for the same purpose. [1] Consequently, all of the assets of the trust found their way to Teitelbaum and the entity or entities that he controlled, all for the benefit of or on behalf of the trust. At the time of trial, the trust held no assets. [1]
Gross did not himself receive any consideration from River Shipping in exchange for the payments made to it by Derma-Lift. Moreover, he did not receive anything from the trust as a result of the payment made to it in 1980. On July 10, 1980, and September 8, 1980, the trust entered into agreements with Teitelbaum and a person named Jaime Munoz (Munoz) in connection with the purchase of interests in the aforementioned freighters or entities. By "Letter of Agreement" dated July 10, 1980, the following ownership interests in the "M/V River Rose" were *61 established: Gross Family Trust
50 percent
Joey Teitelbaum
25 percent
Jaime Munoz
25 percent
The September 8, 1980, "Memorandum of Agreement" is a more involved document. In it, the parties to it -- the trust, Teitelbaum, and Munoz -- agree to establish a corporation in Panama which will "take title to [an unidentified] * * * vessel". [2] The trust agrees to "invest $ 200,000 towards the purchase and initial operation of the vessel", while Teitelbaum and Munoz "agree to invest the sum of $ 100,000" towards the same end. As a result the trust "shall have a 50% share in the corporation owning the vessel" and Teitelbaum and Munoz "shall each have a 25% share in the corporation owning the vessel". It is further agreed that the vessel purchased will be "brought to Miami and operated through * * * River Shipping Corporation". Provision is also made for the distribution of profit to the investors. [2]
*62 Despite its investment of all its assets (about $ 260,000) in ventures with Teitelbaum, and its ownership interests reflected in the above described agreements, the trust received very little in return from Teitelbaum or River Shipping. During 1981 or 1982, Teitelbaum made about ten payments of $ 4,000 each to the trust. Other than those payments, the trust has received no return of or on its investment. The record does not disclose what disposition was made of these ten $ 4,000 payments. Sometime after the year at issue (1980) Gross attempted to retrieve the trust's investment by threatening suit against Teitelbaum. Teitelbaum informed Gross that the only way the trust could get the money back was if the owners of the freighters brought "drugs in on these freighters" and Gross got involved in Teitelbaum's "ongoing drug deals". As a result of involvement in Teitelbaum's drug deals, Gross delivered drugs to an undercover policeman, was arrested, spent some part of 1984 in the Dade County jail, and lost his medical license. He attempted to practice dermatology anyway, and was arrested for practicing without a license. At the time of trial Gross was serving a prison sentence *63 under house arrest. Gross' mother, Claire, was supporting Gross and his dependent children. The parties have stipulated that Gross is liable for $ 70,143 Federal income taxes and for the addition to tax under section 6651(a)(1) for the year 1980. [3] On his original return filed for 1980 (filed as a joint return with his then wife), he did not report as income the consulting fees earned from Derma-Lift, but instead reported only the $ 14,500 wages earned and an additional $ 19,838 business income. The income thus reported resulted in a total income and self-employment tax liability of $ 5,532. Not until Gross filed an amended return on July 13, 1981 did he report the $ 159,919 consulting fees and a total tax liability of $ 75,675. On December 11, 1981, the Internal Revenue Service sent Gross a letter informing him that payment on his 1980 income tax liability was overdue. On November 3, 1982, the IRS served on Derma-Lift a Notice *64 of Levy on Wages in an attempt to collect Gross' liability for 1980 income taxes. It has been stipulated that the IRS has made all reasonable attempts to collect Gross' outstanding Federal tax liability for 1980 and that any further attempts would be futile. During 1980, in addition to the liability for his 1980 income taxes, Gross had outstanding both Federal Unemployment Tax Liabilities from 1974 and 1975, and Federal Insurance Contribution Act Tax Liabilities from 1972, 1974, and 1975. The Unemployment Tax Liabilities amounted to $ 5,912.83 and the Insurance Contribution Act Tax Liabilities amounted to $ 52,707.65, for a totalof $ 58,620.48. On July 2, 1975, the IRS filed a "Notice of Federal Tax Lien" against Gross for $ 53,890.19 of these liabilities. On May 25, 1979, the IRS filed a "Notice of Federal Tax Lien" against Gross for the remaining $ 4,730.29 of liabilities. These liabilities remained unsatisfied at the time of trial. By 1980, a number of other liabilities had been reduced to judgments against Gross. The following judgments entered against Gross and in favor of private creditors in the years 1976 through 1979 remained unsatisfied at the time of trial:; *65 Date judgment entered
Amount
August 2, 1976
$ 168.60
January 10, 1977
35,441.51
April 1, 1977
766.92
September 8, 1978
141.43
August 20, 1979
1,451.51
$ 37,969.97
Petitioner was also liable, during 1980, on a mortgage indebtedness in the approximate amount of $ 40,000. The total of the aforementioned liabilities, i.e., Gross' liabilities outstanding in 1980, exclusive of 1980 taxes, is $ 136,590.45, and the total including his 1980 tax liability is $ 219,359.45. Gross has maintained no bank accounts since 1975 and, during 1980, he owned no stocks or bonds. The only asset he owned during 1980 was a 50 percent interest in real property located at 500 N.E. 55 Street, in Miami, Florida. In 1980, the property had a fair market value of $ 88,000. The parties have stipulated that on each of the dates July 7, 1980, July 22, 1980, and November 14, 1980 (when the three transfers of Gross' $ 159,919.84 earnings from Derma-Lift occurred), Gross "had incurred total liabilities of $ 219,359.45 and had assets totaling $ 44,000.00". [4] At trial, Gross admitted that he was insolvent throughout 1980. Gross was thus insolvent at the time of the *66 transfers at issue here. OPINION The Commissioner has proceeded against petitioner here under the provisions of section 6901, I.R.C. 1954. That section does not in and of itself create liability in the transferee, but sets up a procedural mechanism by which the Commissioner may pursue a claim against a transferee. Phillips v. Commissioner,283 U.S. 589 (1931). It is well established that the transferee's liability with respect to the transferor's income tax is determined under the applicable State law, Commissioner v. Stern,357 U.S. 39 (1958), which in this case is the law of the State of Florida.[5]
*67 Petitioner does not argue that the transfers in question fail to come within Florida law. Its sole contention is that the Government has proceeded against the wrong transferee. Thus, the only error assigned in the petitioner reads in its entirety as follows: THE GROSS FAMILY TRUST has never received any assets of B. G. GROSS either directly or indirectly.
And in support of such allegation of error the petitioner sets forth that "[t]he assets in question, namely $ 70,143.00 [6] in cash, were passed directly from B. G. Gross to JOEY TEITLEBAUM * * * and to corporations that JOEY TEITLEBAUM controlled". Both at trial and in the skeleton brief filed by petitioner it was plainly indicated that Joey Teitelbaum was the real transferee and that the Government should have proceeded against him rather than against the trust. We hold that there is no merit to the point. [6]
Although *68 the burden of proof to establish transferee liability is upon the Government, section 6902(a) of the Code, the stipulated facts clearly demonstrate that the trust was a transferee. Regardless of whether Joey Teitelbaum or entities under his control may also be classified as transferees -- a matter that we do not pass upon [7] --, the trust itself at the very least was the primary transferee. Moreover, the potential liability of others as transferees would in no way relieve the trust of its liability as a transferee. Benoit v. Commissioner,25 T.C. 656, 667 (1955), vacated and remanded on other grounds 238 F.2d 485 (1st Cir. 1956); cf. Phillips v. Commissioner,283 U.S. 589, 603-604 (1931). In essence, what we have here are three transfers of funds (Gross' consulting fees) which the trust used to invest in the acquisition of a percentage interest in certain freighters or entities controlled by Joey Teitelbaum that owned or in turn controlled the activities of such freighters. In one instance the check reflecting the transfer was made payable directly *69 to the trust. In the other two, the checks were made payable to River Shipping, a corporation controlled by Joey Teitelbaum. However, each of the latter two instances involved nothing more than the telescoping of two separate steps -- the transfer of funds to the trust followed by the trust's investment of those funds -- into a single transfer to an entity controlled by Joey Teitelbaum. The substance of the transaction remains the same. All three instances must be treated as transfers to the trust. Clearly, each of the three transfers of the funds was intended to benefit the trust, and ultimately, the beneficiaries of the trust -- Gross' children. Indirect transfers made, not directly to the transferee but for its benefit, carry with them transferee liability just as do direct transfers. Fibel v. Commissioner,44 T.C. 647, 658 (1965); *70 See Morrison Industries Inc. v. Commissioner,T.C. Memo. 1962-155, 21 T.C.M. 853, 864, 31 P-H Memo. T.C. par. 62,155. As trustee of the trust, Gross had control over the use of his earnings for trust purposes. He chose to have his fees at issue here invested for the trust in ventures controlled by Teitelbaum. His transfers of those funds to Teitelbaum for the trust cannot serve to defeat the transferee liability of the trust that was obviously meant to have the benefit of the funds. Decision will be entered for the respondent.
Footnotes
1. It is not clear whether the $ 69,919.84 and $ 100,000 were payments towards the same two ships, or towards other ships. ↩
2. It is unclear what vessel is involved in this second agreement. However, since the River Rose is the subject of the July 10, 1980, agreement, it is possible that the subject of this agreement is the other vessel, the "River Ark", mentioned in the parties' stipulation of facts. ↩
3. The addition under sec. 6651(a)(1) was calculated to be $ 12,626 in the notice of transferee liability sent to the trust in 1985. The total liability determined therein is $ 82,769, the sum of the $ 70,143 deficiency and $ 12,626 addition. ↩
4. Gross' $ 44,000 assets in 1980 is simply his 50 percent interest in the real property in Miami, unreduced by the $ 40,000 outstanding mortgage liability. ↩
5. Fla. Stat. Ann. sec. 726.01 (1969), governing fraudulent conveyances, provides as follows: Every * * * sale, conveyance, transfer and assignment of lands, tenements, hereditaments, and of goods and chattels, or any of them, or any lease, rent, use, common or other profit, benefit or change whatever out of lands, tenements, hereditaments or goods and chattels, * * * and every bond, note, contract, suit, judgment an execution * * * made * * * [in] fraud * * * to delay, hinder or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, demands, penalties or forfeitures, shall be * * * deemed, held, adjudged and taken to be utterly void, * * * any pretense, color, feigned consideration, * * * to the contrary notwithstanding; * * *. ↩
6. Contrary to that allegation, as shown by the stipulation of the parties, the total assets transferred by Derma-Lift on Gross' behalf, which represented hi 1980 consulting fees, were in the amount of $ 159,919.84. ↩
7. We note, however, that at the time the funds were invested with Teitelbaum on behalf of the trust there appeared to be consideration flowing to the trust which might arguably defeat a claim of transferee liability against him. ↩